JOSEPH P. RUSSONIELLO (CABN 44332)
United States Attorney

BRIAN J. STRETCH (CABN 163973)
Chief, Criminal Division

CHRISTINA HUA (CABN 185358)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102
Telephone: (415) 436-7534
Facsimile: (415) 436-7234
E-mail: tina.hua@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> LAWRENCE E. CRAYTON III, ) <br> ) <br> Defendant. ) | No. CR 07-0803-MMC <br><br> GOVERNMENT'S SENTENCING MEMORANDUM |

The United States hereby submits its sentencing memorandum in the above-titled case. The Probation Officer has properly calculated defendant LAWRENCE E. CRAYTON III's United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") total offense level to be 17 and criminal history category to be I, resulting in a Zone D Guideline range of 24 to 30 months in custody. However, the Probation Officer has recommended a sentence of 12 months and 1 day, based on United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and the sentencing factors outlined in 18 U.S.C. § 3553(a). The United States agrees with the Guidelines calculations recommended by the Probation Officer but disagrees with the recommended sentence. Instead, the United States believes the proper sentence is 24 months in

custody.

## I. STANDARD OF PROOF

Typically, sentencing enhancements must be supported by a preponderance of the evidence standard. United States v. Munoz, 233 F.3d 1117, 1126 (9th Cir. 2000). However, if the combined impact of a contested sentencing enhancement is disproportionate relative to the offense of conviction, the district court must apply the clear and convincing evidence standard of proof. United States v. Riley, 335 F.3d 919, 925 (9th Cir. 2003). While there is no bright-line rule for determining whether the clear and convincing standard applies, the Ninth Circuit will typically look at the totality of the circumstances, weighing several factors. Id., citing United States v. Jordon, 256 F.3d 922, 926 (9th Cir. 2001). This factors include:

> (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged; (2) whether the enhanced sentence negates the presumption of innocence for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment; (4) whether the increase in sentence is based on the extent of a conspiracy; (5) whether the increase in the number of offense levels is four or less; and (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range where the defendant would otherwise have received a relatively short sentence.

Id., citing Jordon, 256 F.3d at 927-29.

In the instant case, the government is seeking a fourteen level increase based both on the loss amount, including relevant conduct, and adjustment in the role of the offense. While the government believes that the question of which standard of proof to apply at sentencing is debatable, the evidence does establish that CRAYTON embezzled over $200,000 and abused his position of trust under both standards. Therefore, the government requests that the Court find by both a preponderance of the evidence standard and by a clear and convincing evidence standard that CRAYTON embezzled over $200,000, and abused his position of trust.

## II. THE PROBATION OFFICER CORRECTLY CALCULATED THE GUIDELINES SENTENCING RANGE TO BE BETWEEN 24 TO 30 MONTHS IN PRISON

The Probation Officer correctly calculated the Total Offense Level to be 17, by applying a 12 level increase for a loss amount greater than $200,000, and applying the two level increase for abuse of position of trust.

//

//

### A. CRAYTON REPEATEDLY EMBEZZLED MONEY FROM AMTRAK BY REPLACING CASH WITH FALSE SERVICE VOUCHERS.

CRAYTON was the sole Amtrak station agent in San Francisco, California. Although Amtrak maintains a station in San Francisco, no trains connect to the San Francisco station. The station serves as a bus terminal where San Francisco passengers bus to the Oakland Amtrak station for train departures. As the station agent, CRAYTON was responsible for supervising the ticket clerks, opening the station, and reconciling the deposits at the end of the day. He counted the cash, and prepared the deposits for the bank. CRAYTON was also responsible for reviewing and correcting the sales reports of subordinate ticket clerks, and then sending the sales report and accompanying documents to a revenue accountant in Philadelphia. In fact, the station agent was the only person who could access and modify the sales reports of other station clerks.

As station agent, CRAYTON could also authorize the issuance of service vouchers. Service vouchers are typically issued to disgruntled customers who suffered a disruption in service, and can be redeemed for Amtrak tickets at Amtrak ticket offices or travel agencies. Attached as Government's Exhibit A is a copy of the front and back of a service voucher. The authorizing ticket clerk or station agent fills out all the information on and signs the voucher. Company policy states that the vouchers are not to exceed $50.00 in value without approval. Company policy also states that the passenger information section in the back of the voucher, which includes the passenger's address and signature, should be filled out.

From 1999 to 2004, CRAYTON used service vouchers to embezzle approximately $235,461.90 from Amtrak. The evidence shows that CRAYTON issued false vouchers in large dollar amounts ranging from approximately $100 to $1000 to fictitious individuals. When CRAYTON reconciled the cash and sales reports from the ticket clerks, CRAYTON would embezzle cash and substitute the cash with fake service vouchers which he signed. CRAYTON would also alter the other clerks' electronic sales reports and replace a cash item with the service voucher item in these sales reports in order to hide the embezzlement. Attached as Government's Exhibit B is a copy of a 920 sales report. On both pages, Line 58 indicates the

GOVERNMENT'S SENTENCING MEMORANDUM
CR 07-0803-MMC                     3

amount of service vouchers deposited on that date and line 83 indicates the amount of cash receipts. On the top left hand corner of the second page lists the name of the agent who modified the sales report.

### B. THE EVIDENCE IS CLEAR AND CONVINCING THAT CRAYTON EMBEZZLED APPROXIMATELY $235,461.90 FROM AMTRAK.

In November 2004, the Amtrak Office of Inspector General (OIG) was notified of certain irregularities occurring at the San Francisco Station with regard to service vouchers. A staff member had noticed that San Francisco was issuing numerous service vouchers well exceeding the $50.00 limit. The OIG reviewed the service vouchers and conducted interviews. The vast majority of the service vouchers issued from San Francisco were issued by CRAYTON. During interviews, the subordinate sales clerks all denied issuing service vouchers for over $50. On December 1 and 2, 2004, OIG agents interviewed CRAYTON and CRAYTON initially denied any wrongdoing. After he was confronted with some evidence, CRAYTON admitted, among other things, that (1) he began to issue the fake vouchers in 1998, shortly after becoming station agent; (2) "higher dollar amounts were all fake and had been prepared by him"; (3) while he may have issued some legitimate vouchers, the amounts of the legitimate vouchers were typically low; and (4) only he, and not others, was involved in the embezzlement. Furthermore, CRAYTON explained that he was able to embezzle the funds because he had the ability to correct and approve other clerks' entries in the daily sales reports. CRAYTON confessed that he would replace a cash item with the service voucher or transportation voucher in the sales reports. CRAYTON stated that he would then take cash from the cash drawer and replace it with the service voucher in order to balance the daily sales report. CRAYTON also told agents that he used the money to purchase life insurance, provide for his family, make house payments, and assist his sister-in-law with making house payments.

Based on what they learned in the investigation, the OIG agent created a spreadsheet whereby he listed by voucher all the amounts which CRAYTON embezzled. Attached as Government's Exhibit C is a copy of this spreadsheet. The total loss amount on the spreadsheet for 1999 through 2004 is $239,250.90. For the majority of the entries contained in this

GOVERNMENT'S SENTENCING MEMORANDUM
CR 07-0803-MMC                                      4

spreadsheet, each entry was supported by a copy of a service voucher which CRAYTON signed. The remaining entries, which total approximately $29,650.90, are supported by the 920 Sales Reports which CRAYTON reconciled and modified. Yesterday, the government received specific objections to many of the items on the spreadsheet. As set forth below, the government agrees with some of the defense attorney's objections and believes the loss figure should be changed to **$235,461.90**.

        1.    <u>Entries Supported by Service Vouchers Signed by Crayton Show by Clear and Convincing Evidence That the Loss Amount Is Greater than $200,000.</u>

The majority of the entries are supported by copies of service vouchers which CRAYTON himself signed. These entries show by clear and convincing evidence that CRAYTON committed the embezzlement of the amounts listed in each entry. CRAYTON himself admitted that the vouchers he issued in the higher amounts were all fake, and as set forth in Government's Exhibit C, the dollar amounts well exceed the $50.00 limit. In fact, most of the dollar amounts in the spreadsheet are between $100 to $1000. Furthermore, given that San Francisco, where CRAYTON was the Station Agent, was a bus terminal and not a train depot, one would expect to see very few legitimate service vouchers to be issued from San Francisco. Typically, a passenger will complain about train service upon arriving at the train station itself, such as the Oakland station. However, the number of vouchers which had been allegedly redeemed in San Francisco during th relevant period was more than Penn Station in New York and the Chicago train station combined.

In addition, CRAYTON did not fill out the vast majority of the backs of the fake service vouchers, which requires the passenger's name, address, and signature. Even before CRAYTON admitted his wrongdoing during his interview on December 2, 2004, CRAYTON stated that he knew it was wrong not to take down the name and address of the passengers on the service vouchers. In fact, it appears that the few legitimate vouchers signed by subordinate clerks and CRAYTON all contained the passenger's name, address, and signature.

Furthermore, beginning in the latter half of 2001, CRAYTON began to make notations on the backs of the vouchers that a conductor, the International Sales Office, or the Reservation

GOVERNMENT'S SENTENCING MEMORANDUM
CR 07-0803-MMC                                                      5

Sales Office asked him to issue that voucher. However, neither conductors nor sales offices typically contact ticket agents to instruct them to issue service vouchers. Conductors have the authority to issue their own vouchers for disruptions on the train, and would not contact a sales clerk or station agent to issue a voucher on their behalf. If the International Sales Office or Reservation Sales Office found it necessary to issue some sort of complimentary item to a customer, that item would be mailed out from the Customer Relations Office. Therefore, a loss calculation of $235,461.90 based on the Service Vouchers which CRAYTON signed is supported by clear and convincing evidence.[1]

### 2. Entries Which Are Supported by 920 Daily Sales Reports But Not Service Vouchers Should Not Be Deducted from the Final Amount.

Some of the entries were not supported by service vouchers, but were supported by the Daily Sales Reports created or modified by CRAYTON. These entries are identified on the spreadsheet because both the ticket number and the passenger name is listed as "unknown." Defendant objects to the inclusion of these service vouchers in the loss total. He claims that 103

---

[1] Previously, the government also conveyed to the probation officer and defense counsel that data analysis showed that most of the ticket numbers on the false vouchers were invalid. See PSR ¶ 7. Last week, the government forwarded defense counsel's preliminary objections to the loss amount to the case agent, and asked him to research the validity of those objections. On Monday, after researching the objections, the agent informed undersigned government counsel that he has since learned that the last 6 digits of the ticket numbers repeat once the 6 digit sequence finishes. Therefore, a computer analysis that a particular ticket number was invalid as of August 29, 2006 (when the data analysis was done), may not necessarily mean that the same ticket number was invalid when CRAYTON submitted the false voucher. Upon discovery of this fact, the government immediately contacted defense counsel and probation.

Other evidence also shows that many of the ticket numbers were invalid. Some of the ticket numbers also has more digits than the legitimate 13 digits (comprised of the 3 digit Julian calender date, 4 digit public ID number, and 6 digit sequential remainder in the ticket number). The first three digits refer to the Julian calender date of when the ticket was issued. For example, the numbers 351 in the ticket number refers to the 351st day of the year. Some of the vouchers have ticket numbers where the first three digits were greater than 370, which exceeds the valid Julian calender numbers assigned. The next four digits are comprised of the public ID number of the Amtrak employee who issued the ticket. The majority of the public ID numbers listed in the ticket numbers were those of San Francisco agents, despite the fact that all the trains originated from stations outside of San Francisco. However, as discussed above, the evidence is sufficient to show that CRAYTON embezzled $235,461.90, even without relying on invalid ticket numbers.

GOVERNMENT'S SENTENCING MEMORANDUM
CR 07-0803-MMC                                  6

entries totaling $29,650.90 should be deducted because there are no accompanying service vouchers. Despite the fact that the service vouchers are not available as to these items, circumstantial evidence proves by clear and convincing evidence that CRAYTON was the individual who issued these vouchers. CRAYTON is listed as the agent in each of these entries who accessed or manipulated information in the sales report. The sales report contained specific information about the alleged service voucher, including the voucher number, the voucher amount and which agent allegedly accepted the voucher. CRAYTON admitted to manipulating the clerk's entries in the sales reports, and admitted that the higher entries were fake vouchers. Furthermore, he similarly manipulated hundreds of other sales reports totaling over $200,000, which are supported by service vouchers signed by CRAYTON himself.

As the station agent, CRAYTON had the duty to review the vouchers and sales reports, and report any suspicious entries and misuse of service vouchers. Given that CRAYTON confessed that he had the responsibility to reconcile the daily sales reports and manipulated the subordinate clerk's entries, and given that hundreds of other sales reports corresponded to fake service vouchers which CRAYTON signed, the evidence is clear and convincing that the entries which were supported by these sales reports can be included in the loss amount.

Note that as Station Agent, CRAYTON was responsible for maintaining the voucher books which contain copies of vouchers issued. CRAYTON's supervisor stated in an interview that he has looked at voucher books held by CRAYTON, but they appeared to be in order. He suspected that CRAYTON may have maintained two voucher books, and may have shown him the legitimate one. However, when agents asked CRAYTON for the voucher booklets, CRAYTON stated that he did not know where any of them were stored. Therefore, the evidence is clear and convincing that CRAYTON is also responsible for the $29,650.90 loss proven by the 920 Daily Sales Reports.

>   3.  <u>Entries Where Other Clerks Signed the Vouchers Should Be Deducted from the Spreadsheet.</u>

Defense counsel has requested that line numbers 45, 71, and 102 be deleted from the total because those entries appear to be signed by other ticket clerks. The government agrees that

GOVERNMENT'S SENTENCING MEMORANDUM
CR 07-0803-MMC                       7

these vouchers appears to be signed by others, and should be deducted from the total. The total amount deducted should be $800 ($100 + $500 + $200).

        4.        <u>Entries Where Other Station Agents Reconciled the Vouchers and Prepared the Daily Sales Report Should Be Deleted from the Total.</u>

After reexamining the spreadsheet, the agent has found 2 sales reports which were reconciled by someone other than CRAYTON. Although CRAYTON is the only station agent in San Francisco, another employee may substitute for him in preparing the daily reports when he is absent. It appears that on May 20, 2001, and July 1, 2001, CRAYTON did not prepare the Daily Sales Report. Therefore, the 4 vouchers associated with those dates (lines 152, 153, 168 and 169) totaling $924.00 ($291 + $152 + $150 + 331.20) should be subtracted from the total loss amount.

        5.        <u>Entries Where the Service Vouchers and the 920 Are Missing Should Be Deleted from the Total Loss Amount.</u>

On July 22, 2008, defense counsel notified government counsel that she was missing certain vouchers and sales reports for items in the spreadsheet. I have received those items from the agent and will send them to defense counsel. However, the government can not locate the sales reports and vouchers supporting line numbers 219, 385, and 433. These items totaling $915.00 ($140 + $475 + $300) should be deducted from the total loss amount.

        6.        <u>Entries 1, 7, 10 and 16 Which Defendant Alleges Contain Different Handwriting in the Address Portion Can Be Deleted.</u>

Defense counsel has requested that the government deduct items 1, 7, 10, and 16 from the spreadsheet because the handwriting on the passenger information section on the back of the vouchers appear to be different from CRAYTON's handwriting. Indeed, the vast majority of the false service vouchers do not have the passenger information section filled out. Although the government believes that 2 of contested vouchers contain handwriting similar to CRAYTON's handwriting, in the abundance of caution, the government agrees to deduct $1150 ($500 + $200 + $200 + $250) from the total loss amount. Therefore, the total loss amount, after subtracting all the reductions stated above ($800, $924, $915, and $1150) is **$235,461.90.**

    **C.**    **CRAYTON ABUSED HIS POSITION AS STATION AGENT TO EMBEZZLE AT LEAST $235,461.90 FROM AMTRAK.**

GOVERNMENT'S SENTENCING MEMORANDUM
CR 07-0803-MMC        8

When a defendant abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense, two points are added to the offense level. U.S.S.G. §3B1.3.  The evidence is clear and convincing that CRAYTON abused his position of trust because he used his position to reconcile the sales reports in order to embezzle the cash and offset the cash he took with service vouchers.  Because of this abuse of his position, CRAYTON stole at least $235,461.90 over a period of 6 years, and the probation officer correctly applied a two level increase for abuse of position of trust.

### III.     CRAYTON IS NOT ENTITLED TO ANY BOOKER AND 3553(A) REDUCTIONS, AND SHOULD BE SENTENCED TO 24 MONTHS IN PRISON.

In United States v. Mix, 457 F.3d 906, 911 (9th Cir. 2006), the Ninth Circuit discussed the two-step procedure for reviewing sentences pursuant to Booker.  First, the district court must correctly calculate the sentencing range prescribed by the Guidelines.  Id.  "In addition, a district court must apply the factors enumerated in 18 U.S.C. § 3553(a) in its sentencing decision."  Id. citing United States v. Cantrell, 433 F.3d 1269, 1279-80, (9th Cir. 2006).  Most recently, the Supreme Court in Rita v. United States, 127 S.Ct. 2456, 2464-65, 168 L.Ed.2d 203 (2007) has found that courts of appeals may apply a presumption of reasonableness in reviewing sentences within the properly calculated Guidelines range.  The Supreme Court explains:

> The result is a set of Guidelines that seek to embody the §3553(a) considerations, both in principle and in practice.  Given the difficulties of doing so, the abstract and potentially conflicting nature of § 3553(a)'s general sentencing objectives, and the differences of philosophical view among those who work within the criminal justice community as to how best to apply general sentencing objectives, it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.

Probation recommends a sentence of 12 months and one day in prison, and generally attributes this large decrease in sentence recommendation to the fact that he is a Vietnam Veteran, has some mental history, as well as diabetes, high blood pressure, and high cholesterol. Probation also notes that CRAYTON volunteers at his church.  The government's difficulty with Probation's recommendation is that none of the aforementioned characteristics, even in combination, warrants such a large departure.  First, it is unclear how much, if at all, of CRAYTON's prolonged embezzlement was directly attributed to any mental disorders.

GOVERNMENT'S SENTENCING MEMORANDUM
CR 07-0803-MMC                                              9

Furthermore, there is no expert opinion that the defendant had a mental illness which "significantly impaired his ability to "(A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." See U.S.S.G. §5K2.13. Similarly, there is no indication that his diabetes, high blood pressure, or high cholesterol, or the amount of involvement he has with his church should warrant any type of departure consideration.

Rather, the government submits that CRAYTON's behavior suggests that he knowingly and repeatedly embezzled money from Amtrak and therefore, should not be entitled to a sentence lower than the correct Guideline sentencing range. This embezzlement took place for approximately 6 years, and totaled at least $235,461.90. Given his position, CRAYTON was able to embezzle a large amount of money over a long period of time without being caught. This high loss amount and repeated nature of CRAYTON's misconduct suggest that the personal characteristics of the defendant do not completely outweigh the "need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" to reduce CRAYTON's Zone D sentencing range of 24 to 30 months by half to a sentence of 12 months and a day. See 18 U.S.C. § 3553(1)(2)(A). A sentence at the low end of the sentencing range is reasonable, as it reflects the seriousness of the offense and the need to provide deterrence, as well as his factoring in CRAYTON's personal characteristics.

The Court should use its discretion to impose a sentence at the low end of the Guidelines, both because Guidelines sentences reduce unwarranted sentencing disparity and because the Congressional and Sentencing Commission policies reflected in the Guidelines are sound. See Rita v. United States, 127 S.Ct. at 2464-65 (. . . "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."). If the Court does find that a sentence within the guideline range is reasonable, the fact that both the sentencing court and the Commission agree on the sentence "significantly increases the likelihood that the sentence is a reasonable one," id. at 2463, because "when the judge's discretionary decision accords with the Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable,"

GOVERNMENT'S SENTENCING MEMORANDUM
CR 07-0803-MMC                             10

id. at 2465. Therefore, the government respectfully requests that the Court sentence CRAYTON to a sentence within the guideline range of 24 months in prison.

DATED: July 23, 2008                                  Respectfully submitted,

JOSEPH P. RUSSONIELLO
United States Attorney


_____/s/_____
CHRISTINA HUA
Assistant United States Attorney

GOVERNMENT'S SENTENCING MEMORANDUM
CR 07-0803-MMC                                11