1  BARRY J. PORTMAN
   Federal Public Defender
2  ELIZABETH M. FALK
   Assistant Federal Public Defender
3  450 Golden Gate Avenue
   San Francisco, CA  94102
4  Telephone:  (415) 436-7700

5  Counsel for Defendant CRAYTON

6

7                    IN THE UNITED STATES DISTRICT COURT

8              FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10  UNITED STATES OF AMERICA,           )
                                        )   No. CR-07-803 MMC
            Plaintiff,                   )
11                                      )   **DEFENDANT'S SENTENCING**
    vs.                                 )   **MEMORANDUM**
12                                      )
    LAWRENCE E. CRAYTON,                )   Date:      July 30, 2008
13                                      )   Time:      2:30 p.m.
            Defendant.                   )   Court:     The Honorable Maxine M.
14                                      )              Chesney
    _____ )
15

16                          **INTRODUCTION**

17
        Lawrence E. Crayton now appears before this Court for sentencing following his conviction for
18
   theft concerning programs receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A).
19
   According to the Probation Officer's calculations, Mr. Crayton's total offense level is 17 and his
20
   criminal history category is I, yielding a Guideline range of 24 to 30 months. *See* PSR at ¶ 17.
21
   However, in recognition of several factors under 18 U.S.C. § 3553(a), including Mr. Crayton's
22
   otherwise honorable past, the circumstances he has faced in life, as well as his life accomplishments,
23
   the Probation Department has recommended a sentence of twelve (12) months and one day, which is
24
   a significant departure from the suggested Guideline range. *See* PSR Addendum, Sentencing
25
   Recommendation.
26

The Probation Officer's recommendation for a custodial sentence in this matter is in large part based on her adoption of the government's loss amount assessment, which was provided in spreadsheet format to the Probation Officer and is attached to Mr. Crayton's Objections Memorandum at Exhibit A.[1]  This spreadsheet states that the loss amount attributable to Mr. Crayton over the five year period, between 1999 and 2004, is $239,250.90.  *See* PSR at ¶ 9-10.  As explained in detail in defendant's separately filed Objections to Loss Amount Calculations under U.S.S.G. § 2B1.1, this spreadsheet 1) contains numerous errors, 2) makes assumptions about losses that are unsupported by the discovery, and 2) greatly overstates the loss that Mr. Crayton is responsible for. While Mr. Crayton is more than willing to accept full responsibility in this matter and will stipulate to a loss amount between $70,000 and $120,000 to account for the illegitimate service vouchers that he cashed out, he cannot accept the government's theory that every single service voucher he ever wrote out or accepted while employed at Amtrak was fraudulent.  On numerous occasions, Mr. Crayton wrote out and/or accepted genuine service vouchers as compensation for disrupted passengers for a variety of reasons – and these legitimate vouchers also appear to be included in the government's loss calculation.  The government's "kitchen sink" approach to loss amount does not account for these numerous legitimate vouchers, which has resulted in a spreadsheet that tallies an unfair and unjust calculation of loss that this Court should not rely upon at sentencing.  A far more accurate estimate of actual and intended loss amount in this case is Mr. Crayton's memory of the proportion of vouchers he wrote for legitimate reasons, which is the basis of his stipulation to a loss

---

[1] As the objections to the loss amount adjustment under U.S.S.G. § 2B1.1 are numerous, require substantial documentation and are somewhat complex due to the nature of the loss alleged, Mr. Crayton has filed his Objections to Loss Amount Calculation under 2B1.1(b)(1) as a separate document which explains in detail his request that the Court increase the Base Offense Level by 8 levels, rather than 12 levels.  This Sentencing Memorandum addresses the Guideline adjustment for Abuse of Position of Trust and, incorporating the Objections Memorandum and its attachments, requests the Court to find an overall Offense Level of 12, Criminal History Category I, or 10-16 months in Zone C.  The instant memorandum also addresses the numerous factors applicable to this case under 18 U.S.C. § 3553(a) and requests a downward variance from the suggested Guideline range of 10-16 months as a split sentence (5 months of custody followed by 5 months of community or home confinement) to 10 months of halfway house custody or home confinement.

1  figure between $70,000 and $120,000.  The proper adjustment under U.S.S.G. §2B1.1(b)(1) should

2  be +8, and the correct offense level assigned to this matter should be Offense Level 12.

3  Even more important than the ultimate Guideline calculation this Court arrives at, however, are

4  the factors at issue in this case under 18 U.S.C. § 3553(a).  Specifically, the particular circumstances

5  of Mr. Crayton's life, including 1) his family obligations, 2) his posttraumatic stress disorder (PTSD)

6  resulting from his service in the Vietnam War, 3) his wife's medical condition at the time the offense

7  began and her current inability to work, are factors this Court should consider when fashioning a just

8  sentence "no greater than necessary" to fulfill the goals of sentencing.  *See* 18 U.S.C. § 3553(a).  The

9  Court should also consider the strides Mr. Crayton has made to rebuild his life in an honorable

10  manner over three years that have passed between Mr. Crayton's resignation from Amtrak and the

11  indictment in this case.  As the sole source of financial support for a family of five, Mr. Crayton is

12  proud to report that he rebuilt his life after his disastrous mistakes at Amtrak and now earns an

13  honorable living as a bus driver for A.C. Transit earning $20.88 per hour.  Even a short period of

14  incarceration will cause Mr. Crayton to lose this steady employment, and the loss of Mr. Crayton's

15  income will undoubtedly force the family from their homestead, absent financial support.  At 60

16  years old, as a convicted felon in a depressed economy, Mr. Crayton's chances for gainful

17  employment at this salary following a period of incarceration will be sorely limited.

18  As ashamed and embarrassed as Mr. Crayton is over the instant offense, he must plead with

19  this Court for a sentence that will enable him to continue to work at a job that took him over a year to

20  find, apply for and train for.  At his age and level of education, jobs that pay $20.00 an hour are not

21  easy to come by.  Undersigned counsel accordingly requests this Court to sentence Mr. Crayton in a

22  manner that sufficiently punishes him, but also enables him to continue supporting his family and

23  will allow him to pay meaningful restitution.  He is willing to serve any term that this Court sees fit

24  to impose, but requests that he be allowed to serve that sentence in home confinement or at a halfway

25  house, rather than in BOP custody.

26  \\

# STATEMENT OF FACTS

### A.    Mr. Crayton's Service in Vietnam and His Resulting Mental Health Issues

Mr. Crayton served as a United States Marine in the Vietnam War between 1968 and 1970.  He was stationed in Japan, where his job was to fly aircraft into combat areas to deliver supplies such as food and water to troops on the ground.  As his job required him to fly directly into combat zones, he witnessed countless traumatic and violent events, which caused him various mental health issues.

Unfortunately, like most Vietnam veterans, Mr. Crayton did not receive adequate or appropriate mental health care or benefits after he returned from his military service.  After two years of an intensive military experience in which he was trained to think only about killing, Mr. Crayton's transition back to life in Monroe, Louisiana was anything but smooth.  He suffered memory loss and incoherent thoughts, and he was plagued by auditory hallucinations urging him to kill.  He applied for mental health treatment and benefits at two different Veterans Administration hospitals, and did not receive so much as an appointment for counseling from either location.  He struggled to maintain steady employment and he continued to have violent thoughts.

After the Veterans Administration in Louisiana declined to help Mr. Crayton, he learned alternative coping mechanisms.  He sought support from his mother and he began attending church.  He also coped with his mental health issues by self-medicating with marijuana and cocaine – a fact that Mr. Crayton is not proud of.  This self-medication resulted in moderate drug use on the part of Mr. Crayton through 1992, at which time he became disgusted with himself, and quit.  He has enjoyed continued sobriety since that date.

When he moved to California in 1972, Mr. Crayton applied for assistance and mental health treatment benefits at the Veteren's Administration for the third time.  Although he did not receive psychological treatment, the Oakland VA did arrange for Mr. Crayton to receive university education at California State University's Hayward campus.  While this university education was valuable for Mr. Crayton, he continued to suffer psychologically.  It was not until 2005 – over 30 years after his return from the Vietnam War – that Mr. Crayton received mental health services related to his

1  Marine Corp Service for the first time at the Oakland VA Clinic.  *See* Declaration of Elizabeth Falk

2  ("Falk Dec."), filed separately under seal at Exhibit AA (Medical Records of Lawrence Crayton), at

3  MED 183-192.  At that time, Mr. Crayton was diagnosed with posttraumatic stress disorder (PTSD)

4  stemming from his experiences in the Vietnam War, as well as Major Depressive Disorder,

5  Recurrent.  *See* Falk Dec., Exhibit AA, MED 191.   Between August, 2005 and November, 2005,

6  Mr. Crayton was placed on a variety of psychiatric medications including Fluoxetine and Trazodone,

7  after which he began to feel substantially better.  *Id*. at MED 161-162.  At this time, he is able to

8  manage his PTSD through the use of the aforementioned medications, which have also helped him

9  cope with the stress of the instant indictment and the possibility that he may lose his job and not be

10  able to care for his family in the future.  *Id.* at MED 124.

11      **B.**    **Mr. Crayton's History After Service in Vietnam Through Employment with Amtrak**

12        Despite Mr. Crayton's depression and PTSD following his service in the Vietnam War, he

13  moved forward in his life.  He married Linda Howard in 1976.  When Mr. and Mrs. Crayton married,

14  her children from previous relationships were aged four, nine, eleven, and 14, and Mr. Crayton

15  assumed responsibility for their care as if they were his own.  Mr. Crayton's sister notes: "I know

16  that the children love Lawrence as their biological father.  In this day and time, this is very rare."  *See*

17  Letters of Support for Lawrence Crayton, attached hereto as Exhibit AAA, at LET 010.

18        Times were not easy for the Crayton family from 1976 through 1992.  Mr. Crayton struggled to

19  maintain employment in a variety of states, including Texas and California, but was laid off due to

20  industry downturns (such as the oil industry crisis of the early 80s) as well as substance abuse

21  problems.  *See* Letter of Linda Crayton, Exhibit AAA, at LET 05.  His wife Linda, initially forced

22  into early retirement in 1984, was unable to work after than date due to physical disabilities.  *See*

23  Letter of Patricia Ford, Exhibit AAA, at LET 2; *see also* Letter of Reggie Howard, Exhibit AAA at

24  LET 11.  Mr. Crayton attended two separate treatment programs to try to kick his narcotics addiction,

25  while facing intermittent unemployment.  *See* Letter of Linda Crayton, Exhibit AAA at LET 05.

26        Starting in 1992, however, things substantially improved.  On his own initiative, Mr. Crayton

1   became sick of the way drugs were affecting his life, and quit using controlled substances once and

2   for all.  His sobriety encouraged him to seek more advanced job opportunities, which led Mr.

3   Crayton's to Amtrak in 1993.  He maintained this job for eleven years.  Given Mr. Crayton's level of

4   education and job experience, the fact that he obtained a job at Amtrak with a decent salary was a

5   source of pride for himself and the remainder of his family.  *See* Letter of Charlotte Crayton, Exhibit

6   AAA at LET 13.   Indeed, Mr. Crayton's employment at Amtrak was critical to the family's long

7   term financial survival – in 1993, Mrs. Crayton's adult daughter Linda Williams and her two young

8   children, Nkenge (then age 9) and Bianca (then age 3) lived with the Craytons, and Mr. Crayton's job

9   was the family of five's sole source of income.

10  **C.    Mr. Crayton's Wife's Breast Cancer Diagnosis and Correlating Financial Strain
            Regarding Their Homestead**

11  In September 1997, prior to Mr. Crayton's commission of the present offense, his wife Linda

12  Crayton was diagnosed with breast cancer.  *See* Declaration of Elizabeth Falk ("Falk Dec."), filed

13  separately under seal, Exhibit BB (Medical Records of Linda Crayton) at LIN 001-02.  Her treatment

14  progressed rapidly; less than a month after her initial diagnosis she underwent needle localization

15  and biopsy and received a lumpectomy.  Falk Dec., Exh. BB, LIN 002-04.  Understandably, the

16  sudden nature of Mrs. Crayton's diagnosis and treatment caused Mr. Crayton and his wife substantial

17  stress, particularly due to the fact that Mrs. Crayton experienced severe pain and suffered from

18  frozen shoulder syndrome for many months after her lumpectomy.  Falk Dec., Exh. BB, LIN 004,

19  011, 014.  Despite receiving intensive physical therapy, she was unable to move her arm, and both

20  she and Mr. Crayton worried that her condition would not improve.  In addition, the two worried

21  about whether or not the cancer in her breast would return or lay dormant in another part of her body.

22  Furthermore, shortly after Mrs. Crayton's breast cancer diagnosis, the Craytons experienced

23  significant financial stress resulting from foreclosure proceedings against the home that they lived in

24  and rented from Mr. Crayton's sister, who was then living in Arizona.  As of 1997, the Crayton home

25  at 3535 Meadow Street was located in an undesirable neighborhood in Oakland, and had fallen into

26  some disrepair.  Mr. Crayton's sister, who was only charging the family $600 a month in rent, fell on

DEFENDANT'S SENTENCING MEMORANDUM
*UNITED STATES v. CRAYTON*, 07-803 MMC        **- 6 -**

hard financial times herself and stopped making house payments.  By early 1998, the Craytons had been served with a notice to vacate – only months after Mrs. Crayton's breast cancer surgery.   The foreclosure compounded the psychological distress Mr. Crayton felt about the uncertainty of his wife's medical condition; as the family patriarch, he wanted to restore a sense of stability to Mrs. Crayton so she could concentrate her efforts on recovery.  As Mr. Crayton was the sole provider for his ill wife, stepdaughter, and two step-grandchildren at the time, he felt desperate to remain in the house and arranged a transfer of title to himself from his sister to try to stall the foreclosure.  As a result of this action, the Craytons then assumed the home's substantial existing debt and had to take out additional loans to finance the house.  These loans required regular monthly payments that far exceeded their previous rental obligation.  While his monthly expenses skyrocketed, Mr. Crayton's income remained constant.  He had dug himself a hole that he couldn't easily retreat from.

To make matters worse, in September, 1999, Mrs. Crayton's doctors discovered a mass in her intestine that required surgery.  Falk Dec., Exh. BB, LIN 004-05.   This mass was both initially diagnosed as colon cancer, which was confirmed in October 1999 after a successful removal.  *Id*. at LIN 06.  This second bought of cancer heightened Mr. Crayton's insecurity about his wife's condition; after two sudden detections of serious medical problems, he was constantly anxious that she would fall ill with recurrent cancer or another unknown illness and not recover.  He became more determined to provide her with basic comforts, such as a stable, decently furnished residence, and tried to hide the family's financial problems from her as much as possible.  It is against this backdrop of financial and psychological stress that Mr. Crayton resorted to the illegal conduct for which he now feels sincere remorse.[2]

\\

---

[2]   It is important to note that this information is **not** provided to the Court in an effort to excuse Mr. Crayton's actions, as he strongly believes that there is no excuse for this theft.  Instead, this family history is cited to provide the Court with the context for Mr. Crayton's poor decisions in this matter and to try to explain the stresses that contributed to Mr. Crayton's uneven mindset at the time this offense commenced.

**D.    Working Conditions at Amtrak Worsened During the Period of the Offense**

Mr. Crayton's job with Amtrak often required that he arrive at work by 6:00 in the morning. He complained to his supervisor that the building was not heated, but his requests were always ignored. Falk Dec., Exh. AA, MED 069. On June 20, 2001, the Amtrak facility experienced a sewage backup due to heavy rains, and sewage from the toilets rapidly overflowed into the offices and train station. *Id.* at MED 097. After taking care of the customers that were present during the sewage flood, Mr. Crayton scrambled to remove important office documents and equipment from the path of the toxic sewage, exposing himself to grossly unsanitary conditions. After the emergency subsided, working conditions at Amtrak that summer remained arduous, due to the stench from the leftover sewage in the office and the unwillingness of the Port Authority to perform an in-depth clean-up on the property. In the weeks that followed, Mr. Crayton's hair began to fall out and his scalp began to flake off. He continued to work from June 20, 2001 onward until his symptoms became unbearable. Mr. Crayton finally sought treatment on August 7, 2001 and was diagnosed with psoriasis and seborrhele dermatitis as a result of interaction with raw sewage. *Id*. at MED 36, 42, 45. The San Francisco station was subsequently closed from August 9, 2001 through the end of the year to clean up the contamination problems left by the residual sewage. Mr. Crayton's primary care doctor treated his peeling skin for two months, and directed him to complete psychological counseling to better handle the episode. Mr. Crayton subsequently took medical leave for four months because his physical appearance was too shocking to interact with others publically. *Id.* at MED 035-36, 43.

Mr. Crayton's doctor told him that the psoriasis was a result of exposure and stress due to the sewage flood. *Id.* at MED 45. Psoriasis is a condition of excess skin production which causes red and silver scaly patches to develop all over one's skin. *Id*. at MED 039. Mr. Crayton's psoriasis was located on his scalp, chest and leg, and caused all of his hair to fall out, replaced by scaly patches and peeling skin. *Id*. at MED 083. As a result of this condition, Mr. Crayton became severely depressed and deeply ashamed of his appearance such that he felt unable to face the public. *Id.* at MED 071-

73. He began seeing psychologist, Dr. Philip Coleman, once a week, who diagnosed him with major depressive disorder and placed him on antidepressants. *Id.* at MED 083 - 088. The sewage incident and its resulting affect on Mr. Crayton's life furthered his previously existing stress and mental health issues. He remembers that period of time as one in which he was not functioning well with family members and friends.

Mr. Crayton returned to Amtrak after his psoriasis improved, and he remained there until the company discovered his theft in 2004. Mr. Crayton reports that while he engaged in the theft he knew it was wrong and tried to stop, but that he became dependent on the extra income. He felt sincere relief when his conduct was discovered; he quickly admitted to the offense, cooperated with Amtrak, and expressed his deep remorse for his dishonest conduct. In November of 2004, Mr. Crayton resigned from his position pursuant to an agreement with his supervisor that Amtrak would not take further disciplinary action and Mr. Crayton would not lose his retirement fund. The indictment in the instant case did not follow until December, 2007.

**E.    By the Time of His Indictment, Mr. Crayton Had Been Living an Honest and Admirable Life for Over Three Years**

It was not until over three years after the end of Mr. Crayton's offense that he was indicted for theft by the federal government. In April of 2005, after resigning from Amtrak, Mr. Crayton applied to work as an AC Transit bus driver. A competitive position, Mr. Crayton was not invited to participate in AC Transit's training program for nearly a year after he applied. In the interim period, Mr. Crayton worked temporary positions in warehousing and sales and prayed that the more steady AC Transit program would come through. In February, 2006, Mr. Crayton finally got that chance. He passed the training program and began working full time as a bus driver. Once again, much to his relief, Mr. Crayton was able to resume his role as the steady provider for his family of five people.

In addition to Mr. Crayton's work, Mr. and Mrs. Crayton have been caring for their neighbor's child, Ajanae Evans, who suffers from various medical conditions including lupus and rheumatoid arthritis. *See* Letters of Lonetta Evans and Ajanae Evans, Exh. AAA, LET 003, 004. Although Mrs.

1  Crayton charges one other family a nominal fee for daycare services ($100 per week), the Craytons

2  recognize the stress that Ajanae's medical condition causes her family, and they provide her daycare

3  care for her free of charge. Mr. Crayton has made an enormous positive impression on Ajanae, as

4  reported by her mother Lonetta. She notes that Mr. Crayton works very hard as a bus driver, and

5  writes "Larry is invaluable. His support and strength as a surrogate father figure empowers her,

6  empowers us." Id. "One cannot help but notice his fatigue as he unselfishly gives additional and

7  precious few hours to his young great-grandson and to my daughter, when he should be getting the

8  much needed hours of rest before his day starts again. I can't begin to describe the joy on the faces

9  of the children when they are receiving his time and attention." Id.

10    Linda Williams' children, Nkenge Williams, age 24, and Bianca Williams, age 18, continue to

11  live with the Craytons today (Linda Williams has since left the residence) and Mr. Crayton is their

12  primary source of financial support. In 2006, Mr. Crayton witnessed the birth of his great grandson

13  Jayson and assumed complete responsibility for the child's financial maintenance. At 18, Bianca is

14  still in high school. She hopes to attend college and must continue to live with the Craytons to afford

15  schooling. To meet the monthly bills, Mr. Crayton continues to be employed as a bus driver with

16  AC Transit and hopes to continue working there so that he can support his family and pay restitution

17  to Amtrak as this Court deems appropriate.

18    As he struggled to get his life back on track, Mr. Crayton began monthly psychological therapy

19  at the Veterans Administration in 2005. Falk Dec., Exh. AA, MED 105. He was diagnosed with

20  posttraumatic stress disorder, and prescribed appropriate medication. *Id.* at MED 127. Mr. Crayton

21  reports that he felt extreme relief to finally have a doctor listen to him about his posttraumatic stress,

22  after suffering from symptoms for over thirty years. His treatment at the Veterans Administration,

23  including the medication, has enabled his mental health to steadily improve. *Id.* at MED 124.

24  Although Mr. Crayton still struggles with psychological issues, his therapist has helped him to

25  develop tools for coping with his stress, and his medication has improved his mental stability. Mr.

26  Crayton now sees his therapist once every three months.

1    In sum, in the nearly four years since he left Amtrak, Mr. Crayton feels his life has returned to

2    normalcy: he has a good job that allows him to provide for his large family, his wife's cancer is in

3    remission and his fear of her relapse is less prominent, and perhaps most importantly, he has behaved

4    honestly and demonstrated no danger of returning to fraudulent conduct.  Mr. Crayton is also actively

5    involved in his community, as he serves on the Dads Board at the Acts Full Gospel Church of God in

6    Christ, coordinating community service projects including Thanksgiving dinners for the homeless as

7    well as Christmas toy drives.  Exh. AAA, LET 017.  In addition, Mr. Crayton volunteers with the

8    Men of Valor Academy, which mentors young men who are released from prison.  Mr. Crayton visits

9    the Academy at least once a month, where he teaches young men to write and assists them with job

10   applications.

11       The many letters of support written on Mr. Crayton's behalf, in addition to those described

12   above, demonstrate his compassion for and dedication to  his family and community.  His sister

13   Denise Holmes states that "the love and care for his family . . . spills over into all the other

14   relationships in his life." Exh. AAA, LET 010.   Mr. Crayton's stepdaughter remembers a time when

15   Mr. Crayton "help[ed] out a friend that was homeless, living out of his car with his wide, they had

16   nothing to eat, drink, and no where [sic] to bathe their selves [sic] he changed that for them."  Exh.

17   AAA, LET 008.  Mr. Crayton's long-time friend Peter Hurd describes "how he has taken on not only

18   his own family responsibilities but has reached out to others in dyer straights [sic] in an effort to

19   assist them both emotionally and financially."  Exh. AAA, LET 001.  Ten-year-old Ajanae Evans

20   serves as a perfect example of this generosity; she states that "[w]ithout Lawrence I wouldn't be

21   standing . . . .  Lawrence help [sic] me with my medication and help [sic] carry me when it was to

22   [sic] painful for me to walk."  Exh. AAA, LET 004.  Ajanae's mother states that "[h]ad it not been

23   for the loving support of Larry and Linda I'm not sure where we would be emotionally today."   Exh.

24   AAA, LET 003.

25       Mr. Crayton's family members' letters suggest that they feel partly responsible for his crime,

26   because they believe his motivation was his desire to provide for them.  His step-granddaughter

1   Nkenge Williams notes that "[i]t has been a lot of times where I needed help and my grandfather was

2   there helping me with car notes, phone bills, student loans . . . . I have to say he did go a little over

3   broad [sic] trying to help me but it was out of his heart." Exh. AAA, LET 008.  His stepdaughter

4   Linda Williams,  whose children Mr. Crayton raised, pleads with this Court that "[t]he only crime he

5   is guilty of is having to [sic] big of a heart and <u>LOVING</u> his family too much.  And if those actions

6   are crimes I wish every man in the world could be found guilty . . .he has supported us not only

7   emotionally, but most definitely financially, for these reasons I feel that we are partially responsible

8   for the predicament he is in.  I know he never wanted myself, my children, my mother, or almost

9   anyone he came in close contact with to want for anything." Exh. AAA, LET 007.  Mr. Crayton's

10  close friend Patricia Ford notes that his conduct stemmed from his attempt "to be all things to all of

11  the people he love [sic] and cherish [sic]", thereby providing first-hand observation of the fact that

12  Mr. Crayton sense of financial responsibility for numerous people substantially contributed to the

13  instant offense.  Exh. AAA, LET 002.

14      Not only do Mr. Crayton's letters illustrate his compassion and generosity, they demonstrate

15  his acceptance of responsibility for his crime.  Lonetta Evans states that "Larry and his family have

16  suffered and continue to suffer the embarrassment of his mistake.  He is constantly advising family

17  and friends no matter how desperate the situation is there is always the right choice to make using

18  him as an example." Exh. AAA, LET 003.  Mr. Crayton's family friend Patricia Ford, who has

19  known him for over thirty years, states that "he has taken responsibility for his actions, endured the

20  disappointment of his wife and the embarrassment of having his family and friends learn of his

21  misdeeds." Exh. AAA, LET 002.  Mr. Crayton's pastor feels "confident that he has learned the error

22  of his ways and will not make the same mistake twice." Exh. AAA, LET 019.

23      Were Mr. Crayton uprooted from this life and forced to serve a custodial sentence, he, his

24  family, and his community would suffer tremendous financial strain because he would lose the

25  family's steady source of income.  Mr. Crayton's close friend Joe McGill pleads with this Court:

26  "[I]f Larry is granted probation, he will pay back his debt to society lesson learned forever - for good.

1   If Larry is sentenced to do time a whole family would be destroyed." Exh. AAA, LET 018.

2   Furthermore, such a sentence would serve no legitimate public safety purpose, as Mr. Crayton poses

3   no danger of recidivism and would not benefit from the services the prison system has to offer.

4   <center>**ARGUMENT**</center>

5   **I.    Objections to "Starting Point" Guideline Range of 24-30 Months**

6        **A.    The Loss Amount Should Only be Between $70,000 and $120,000**

7        As more thoroughly briefed in the separately filed Defendant's Objections to Loss Amount

8   Calculations under U.S.S.G. §2B1.1(b)(1), the loss amount adjustment in this matter should only be

9   +8, reflecting a loss between $70,000 and $120,000.  Accordingly, for the reasons briefed therein,

10  Paragraph 17 of the Presentence Report should only reflect an upward adjustment of 8.

11       **B.    The Court Should Decline to Impose the Abuse-of-a Position of Trust
              Enhancement**

12       Over the course of the instant offense, Mr. Crayton was employed by Amtrak as the Station

13  Agent, where he earned approximately $32,000 a year.  His job responsibilities included opening the

14  station, ordering stock, conducting a daily cash count, making banking deposits and completing daily

15  sales reports.  Yet the mere fact that Mr. Crayton handled money as a part of his job responsibilities

16  does not support the application of this enhancement.  *See* U.S.S.G. §3B1.3, Commentary n. 1

17  (stating that the enhancement is inappropriate for the case of an embezzlement or theft by an

18  ordinary bank teller).  Instead, the factors that are to be considered are "(1) the inability of the trustor

19  objectively and expediently to determine the trustee's honesty, and (2) the ease with which the

20  trustee's activities can be observed."  *United States v. Hill*, 915 F.2d 502, 506 (9th Cir. 1990).   Here,

21  Mr. Crayton was subjected to monthly audits of his work by his supervisors, including Station

22  Manager Anthony Chapa.  He did not "managerial or professional discretion" that creates the

23  "freedom to commit a difficult-to-detect wrong."  *United States v. Hoskins*, 282 F.3d 772, 778 (9th

24  Cir. 2002)(citing *Hill*, 915 F.2d at 506).   "Section 3B1.3 does not apply simply because an employee

25  has breached an employer's trust."  *Id.* at 779.

26       Mr. Crayton was not employed at a high level at Amtrak; he was not considered even a mid-

1   level manager.  Although Mr. Crayton did supervise other individuals selling train and bus tickets, he

2   was essentially little more than a station clerk who filled out daily sales reports and made bank

3   deposits.  This position did not make it any easier for Mr. Crayton to conceal his offense, as he was

4   still subjected to monthly and yearly audits by supervisors.  Nor did his position require the type of

5   "special skill" that warrants the enhancement, such as "pilots, lawyers, doctors, accountants,

6   chemists, and demolition experts."  *United States v. Mainard*, 5 F.3d 404, 405 (9th Cir. 1993).

7   Accordingly, the Court should decline to apply this enhancement.

8

9   **II.    The Applicable Guideline Range, Once Determined, is Only the Starting Point for this
        Court.**

10      **A.      *Gall* and *Kimbrough* Clarified the Vast Discretion of this Court to Impose a Non-
                Custodial Sentence**

11

12       On December 10, 2007, the United States Supreme Court decided *United States v. Gall*, 128 S.

13   Ct. 586 (2007), and *United States v. Kimbrough*, 128 S. Ct. 528 (2007).  In *Gall*, an ecstasy

14   distribution case in which the defendant was in college at the time of the offense, the district court

15   departed from the applicable Guideline range of 30-37 months and sentenced the defendant to 36

16   months of probation.  The Eighth Circuit reversed the district court's sentence.  In its opinion

17   affirming the district court and reversing the Eighth Circuit, the Supreme Court set forth the proper

18   analysis that district courts should follow in evaluating a proper sentence in the wake of *United

19   States v. Booker*, 543 U.S. 220 (2005):

20           [a] district court should begin all sentencing proceedings by correctly calculating
         the applicable Guideline range.  As a matter of administration and to secure nationwide
21       consistency, the Guidelines should be the starting point and the initial benchmark.  The
         Guidelines are not the only consideration, however.  Accordingly, after giving both
22       parties an opportunity to argue for whatever sentence they deem appropriate, the district
         judge should then consider all of the § 3553(a) factors to determine whether they support
23       the sentence requested by a party.  In doing so, he may not presume that the Guideline
         range is reasonable.  He must make an individualized assessment based on all the facts
24       presented.  If he decides that an outside-Guidelines sentence is warranted, he must
         consider the extent of the deviation and ensure that the justification is sufficiently
25       compelling to support the degree of the variance.

26   *Gall*, 128 S. Ct. at 596-97 (citations omitted).  "It has been uniform and consistent in the

DEFENDANT'S SENTENCING MEMORANDUM
*UNITED STATES v. CRAYTON*, 07-803 MMC        **- 14 -**

1 federal judicial tradition for the sentencing judge to consider every convicted person as an individual

2 and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify,

3 the crime and the punishment to ensue." *Id.* at 598 (citing *Koon v. United States*, 518 U.S. 81, 113

4 (1996)).  Each sentence, regardless of where the sentence falls in comparison to the applicable

5 Guideline range, is reviewed by the Court of Appeals under an abuse of discretion standard.  *Id.*

6 After *Gall*, it is clear that federal district courts now enjoy tremendous discretion on a case-by-case

7 basis at sentencing.

8       **B.**    **The Ninth Circuit Has Declined to Apply A Presumption of Reasonableness to a Guideline Sentence**

9       On March 24, 2008, the Ninth Circuit decided together the cases of *United States v. Zavala* and

10 *United States v. Carty*, 520 F.3d 984 (9ᵗʰ Cir. 2008) (en banc).  In doing so, the Court held that in the

11 Ninth Circuit, "the district court may not presume that the Guideline range is reasonable. . . nor

12 should the Guidelines factor be given more or less weight than any other." *Id.* at 992 (citations

13 omitted).  "While the Guidelines are to be respectfully considered, they are one factor among the §

14 3553(a) factors that are to be taken into account in arriving at an appropriate sentence." *Id.* (citing

15 *Kimbrough*, 129 S. Ct. at 570; *Gall*, 129 S. Ct. at 594).  In weighing these factors, the district court's

16 discretion is not constrained by "distance alone." *Id.*   "Rather, the extent of the difference is simply

17 *a* relevant consideration." *Id.*  The appellate court will only review the substantive reasonableness of

18 the district court's decision by considering the "totality of the circumstances," giving "due deference

19 to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the

20 variance." *Id.* at 992 (citing *Gall*, 128 S. Ct. at 597, 602).   Under *Zavala/Carty*, while this Court is

21 bound to consider the applicable Guideline range, this range is not presumptively the correct

22 sentence for Mr. Crayton.  The Court must consider all the factors under § 3553(a) before

23 pronouncing judgment, and any decisions this Court makes will be granted "due deference" should

24 appellate review ensue.

25 \\

26 \\

III.  **A Sentence Outside of Prison is a Reasonable Sentence in the Instant Case**

A.    **An Analysis of Recent Ninth Circuit Case Law Demonstrates that a Non-Custodial Sentence Would Be Reasonable**

Since *Booker*, district courts have enjoyed increased freedom to consider individuals' unique circumstances and characteristics during the sentencing process.  In light of the Supreme Court's decisions in *Gall* and *Kimbrough*, formally vesting district courts with substantial discretion to fashion individualized sentences that do not conform with the Sentencing Guidelines, courts across the country have exercised this discretion in fraud cases.  Even before *Gall* and *Kimbrough*, the United States witnessed a trend in federal sentencing of downward departure and variance in fraud cases like Mr. Crayton's, where the defendant's criminal behavior was anomalous and non-violent, and the defendant had mental health complications and family obligations.

For example, in *United States v. Menyweather*, 447 F.3d 625, 628 (9th Cir. 2006), the Ninth Circuit upheld an eight-level downward departure for a defendant who had been convicted of mail fraud.  The defendant had used government credit cards to make personal purchases while she was employed at the United States Attorney's Office, and she admitted to a loss amount of at least $350,000.  *Id*.  Finding that the defendant had no criminal history, suffered from posttraumatic stress, and was her daughter's sole source of financial support, the district court imposed a primarily non-custodial sentence of five years' probation, which would include 40 weekend days in custody.  *Id*.  The departure was based on diminished capacity due to posttraumatic stress under U.S.S.G. § 5K2.13 and family circumstances under U.S.S.G. § 5H1.6.  *Id*. at 631.  The Ninth Circuit found that the district court's eight-level downward departure was not an abuse of discretion, and further found that even if it were, such an error would be harmless because of "the court's expanded authority to consider circumstances related to the sentencing factors in 18 U.S.C. § 3553(a)."  *Id*.

The Ninth Circuit vigorously affirmed this "expanded authority" in *United States v. Whitehead*, ___ F.3d ___, 2008 WL 2718867 at *1 (9th Cir., July 14, 2008), stating that "[o]ne theme runs through the Supreme Court's recent sentencing decisions: *United States v. Booker* empowered district courts, not appellate courts . . . . and breathed life into the authority of district court judges to

1    engage in individualized sentencing." (Internal citations omitted.) In *Whitehead*, where the

2    defendant sold over $1 million worth of cards that allowed his customers to steal cable television

3    service, the Ninth Circuit upheld a district judge's decision to sentence him to probation, community

4    service, and restitution, despite the fact that the Sentencing Guidelines recommended a range of 41 to

5    51 months. *Id*. at *2. The Ninth Circuit found it proper for the district court to rely on the following

6    factors: fraud does not pose great danger to the community; the defendant's father testified that the

7    defendant "repented his crime;" the defendant decided after his conviction to devote himself to an

8    honest business; and his "eight-year-old daughter depended on him. . . [and] he doted on her." *Id*.

9        This Court should rely on *Menyweather* and *Whitehead*, which involved facts similar to Mr.

10    Crayton's case, in fashioning a non-custodial sentence. In both cases, fraud defendants stole over

11    periods of time, either from an employer or a corporation. The loss amount to the fraud victims in

12    both cases exceeded Amtrak's loss amount.[3] Furthermore, in *Menyweather*, *Whitehead*, and in the

13    instant case, the defendants were responsible for the care and maintenance of minor children. Like

14    Mr. Crayton, the defendant in *Menyweather* suffered from posttraumatic stress, which played an

15    important role in the court's decision to impose a more lenient sentence. At the time of the

16    commission of the offense, Mr. Crayton had been suffering from untreated posttraumatic stress

17    disorder for over thirty years. The events in his life – including his wife's two surgeries and the

18    sewage flood at Amtrak – only have exacerbated his stress and anxiety, influencing his bad decision

19    to continue to commit the instant offense.

20        *Whitehead* serves as an even more compelling case for why a non-custodial sentence would be

21    proper for Mr. Crayton.  In *Whitehead*, the Court stressed the defendant's decision – post-conviction

22    – to turn his life around, "devot[ing] himself to his house-painting business and to building an

23

24        [3]The defendant in *Menyweather* admitted to stealing between $350,000 and $500,000. 447
       F.3d at 628. The Ninth Circuit in *Whitehead* did not articulate the exact loss amount, but the
25    dissenting opinion stated that the defendant "stole at least $1 million in profits from Direct TV . . .
       [and] bragged online that he had personally earned over $400,000 from his business." 2008 WL
26    2718867 at *2 (Bybee, J., dissenting). Mr. Crayton's Pre-Sentencing Report states that Amtrak's
       loss amount was, at most, $239,250.90. PSR at ¶ 17. This amount is challenged.

1    honorable life." 2008 WL 2718867 at *2. The dissent in *Whitehead* criticized the majority's

2    consideration of this factor, stating that it "amounted to little more than an admission that after he got

3    caught and indicted, he wisely turned to a legitimate form of business." 2008 WL 2718867 at *6

4    (Bybee, J., dissenting). In contrast to the defendant in *Whitehead*, Mr. Crayton began living an

5    honest life long before any involvement with the criminal justice system for this offense. Although

6    his employer discovered his theft, Mr. Crayton's actions to rebuild his life after leaving Amtrak

7    cannot be construed as an attempt to create a mitigating circumstance for the purpose of criminal

8    sentencing, because Mr. Crayton was not indicted until three years after his resignation.

9    **B.    A Downward Departure for Mr. Crayton Is Proper Under the Sentencing Guidelines.**

10    Under U.S.S.G. § 5H1.1, §5H1.5, §5H1.6 and §5H1.11, departures were not generally allowed

11    under the old regime for age, employment record, family ties and responsibilities, and military

12    service. *See* U.S.S.G. § 5H1.1, §5H1.5, §5H1.6 and §5H1.11. Following the Supreme Court's

13    decisions in *Booker*, *Gall*, and *Kimbrough*, however, the Sentencing Commission can no longer

14    prohibit a sentencing court from considering any factor that was either prohibited or discouraged

15    under the mandatory Guidelines regime. Accordingly, this Court may properly consider the fact that

16    Mr. Crayton is nearly 60 years old, has a successful post-offense employment record but will not be

17    easily employable upon release from custody, has extraordinary financial responsibilities, and has

18    served in Vietnam.[4]

19    In this vein, numerous pre and post-*Booker* district courts have found downward departure or

20    variance appropriate in fraud offenses similar to Mr. Crayton's. In *United States v. Coughlin*,

21    Criminal No. 06-20005, 2008 WL 313099, at *5 (W.D.Ark. Feb. 1, 2008), an Arkansas district court

22    both departed and varied from the Guidelines range of 27 to 33 months to impose a sentence of

23

24

25    _____

26        [4] In the alternative, this Court may choose to consider these factors in imposing a downward
variance under 18 U.S.C. § 3553(a).

probation and home detention for a fraud defendant who misappropriated funds from his company.[5]
The defendant's sentence in *Coughlin* reflected a loss amount of over $350,000. *United States v. Coughlin*, 500 F.3d 813, 815 (8th Cir. 2007) (referencing U.S.S.G. § 2F1.1(a) (2000)).  However, the court found departure and variance proper because the defendant's health was poor, he had no criminal history and his offense was non-violent, and because "[n]ot all defendants must be sentenced to imprisonment to be duly punished." *Coughlin*, 2008 WL 313099 at *2–*5.  The court found a non-custodial sentence appropriate punishment for the offense because "home detention . . . subjects [defendant] to a hugely restrictive regime of confinement, compliance, intrusion and dependency." *Id*. at *6.  Although Mr. Crayton is not similarly situated to defendant Coughlin because his health is nowhere near as poor, the spirit of the *Coughlin* decision also rings true here – prison is not always the sentence "no greater than necessary" to adequately punish a fraud offense. Accordingly, a non-custodial sentence is proper in light of Mr. Crayton's unique characteristics and circumstances, as well as the non-violent nature of the fraud.  Like the court in *Coughlin*, this Court should recognize that such a sentence "is far from an act of leniency, and its characterization as such deprives sentencing courts of a valuable and effective form of punishment." *Id*. at *6.

Four years prior to the Supreme Court's decision in *Booker*, under a mandatory Guidelines regime, a New York district court departed downward in a fraud case in which father and daughter co-defendants conspired to evade paying taxes for their business. *United States v. Kloda*, 133 F.Supp.2d 345, 345 (E.D.N.Y. 2001).  The court in *Kloda* calculated a total loss amount of $388,354, yet stated that downward departures for both defendants were justified to address family circumstances. *Id*. at 346.  First, the court departed downward four levels to sentence the daughter to six months imprisonment, "taking into account the need to care for [her] small children." *Id*. at 346. The court allowed the daughter to begin her prison term after her child finished kindergarten, and

---

[5]The Eighth Circuit had initially reversed this sentence, but the Supreme Court decided *Gall* prior to resentencing, and the district court read *Gall* to allow for imposition of the original sentence, largely due to the defendant's serious health issues. *Id*. at *1 – *5.

deferred the father's custodial term until two months after the daughter's term ended so as to minimize disruption in the children's lives. *Id*. The court then determined that the 62-year-old father's circumstances also warranted departure because he claimed to suffer from a heart condition and his wife was in remission after battling cancer. *Id*. In its decision to depart, the court "recognize[d] [defendant's] advanced age and that of his wife, his wife's tenuous relationship with grave cancer, [and] his own heart problems." *Id*. at 349.

Mr. Crayton's family and health considerations mirror those of the *Kloda* co-defendants. He is the sole provider for his family of five, including two young adult children (one of whom is still in high school) and a two-year-old great grandson. Although Mrs. Crayton appears to have triumphed in her battle with cancer, as her last surgery was in 1999, her daughter states that Mr. Crayton's absence would likely be "detrimental to [her] health [because] she depends on him physically, emotionally as well as financially." Exh. AAA, LET 007. Furthermore, in light of *Booker* and *Gall*, this Court has substantially greater freedom than the *Kloda* court to depart from the Guidelines' now advisory sentencing range. Whereas the *Kloda* court was required to point to specific provisions of the Guidelines that justified departure and vigorously defend its decision to follow these provisions, this Court may now exercise considerable discretion in departing downward based on Mr. Crayton's family's financial dependence on him.

In *United States v. Connors*, Criminal No. 06-189, 2007 WL 2955612, at *1 (E.D.Pa. Oct. 9, 2007), a Pennsylvania district court imposed an eight-level downward variance pursuant to § 3553(a) for a fraud defendant who inflated his company's earnings on financial disclosure reports. The defendant in *Connors*, who had sole authority over his company's financial dealings, admitted to a loss amount of over $14 million. *Id*. However, he had no criminal history, he was "motivated by a desire to save the company and to save the jobs of his employees," he "had led an admirable life," and the court found no "significant possibility of recidivism." *Id*. at *3–*5. In addition, the court found that the defendant's "criminal behavior, although long-standing, was aberrant." *Id*. at *5. Accordingly, the court found that the Guidelines sentence of 78 to 97 months was excessive, and

1   varied downward eight levels to 36 months imprisonment followed by home detention and

2   supervised release.

3       Like the defendant in *Connors*, whose loss amount exponentially exceeded Mr. Crayton's, Mr.

4   Crayton's motivation did not stem from purely personal greed.  Rather, his mental health issues, his

5   wife's illness, their home foreclosure, and the resulting financial stress of struggling to provide for a

6   family of five, acted as factors that influenced Mr. Crayton to commit this offense.  Furthermore, like

7   the defendant in *Connors*, Mr. Crayton's lack of criminal history in combination with the nature of

8   his post-offense rehabilitation and letters of support demonstrate that his conduct at Amtrak was

9   aberrant and that he poses little risk of recidivism, which is a further basis to impose a non-custodial

10  sentence.

11      In *United States v. Holz*, 118 Fed. Appx. 926, 930 (6th Cir. 2004) (unpublished table decision),

12  the Sixth Circuit upheld the district court's five-level downward departure for a defendant who

13  subscribed a false tax return.  The court in *Holz* was operating under a pre-*Booker*, mandatory

14  Guidelines scheme, but it nonetheless affirmed the district court's departure from a Guidelines

15  sentence of 12 to 18 months to a non-custodial sentence.  The court found the sentence reasonable

16  because the defendant had demonstrated compelling family circumstances, the defendant's business

17  would not survive without him, and his employees would lose their jobs if he were incarcerated.  *Id*.

18  at 941.  The defendant's wife had mental health problems prior to trial, and the stress of trial

19  exacerbated her mental health condition to such an extreme degree that she suffered a nervous

20  breakdown and was hospitalized.  *Id*. at 930.  Significantly, the district court's conclusion that

21  departure was warranted was based on a finding that "the *combination* of family and business

22  circumstances was extraordinary," despite the fact that family circumstances alone were not

23  extraordinary.  *Id*. at 935 (emphasis in original).

24      Following the district court's example in *Holz*, this Court should recognize that the

25  extraordinary nature of the totality of Mr. Crayton's circumstances justifies a non-custodial sentence.

26  While no isolated circumstance in Mr. Crayton's life may suggest, on its own, an enormous

DEFENDANT'S SENTENCING MEMORANDUM
*UNITED STATES v. CRAYTON*, 07-803 MMC      **- 21 -**

downward variance or departure, the total picture of the instant case recommends itself to a sentence outside of BOP custody.  In sum, the combination of the stress and financial strain caused by Mr. Crayton's wife's cancer, an impending home foreclosure, and a large number of dependants, coupled with his struggles with posttraumatic stress disorder substantially contributed to the instant offense. The government waited over three years to indict this case – in which time Mr. Crayton rebuilt his life and got back on the right track, believing that the Amtrak situation was over.  The December, 2007 summons came as a complete shock to him.  His current circumstances, including his stable employment with AC Transit, his community involvement with Acts Full Gospel Church of God in Christ, and his improved health resulting from psychological treatment with the Veterans Administration hospital, which were initiated by Mr. Crayton prior to the instant indictment, should further compel this Court to find that even a short sentence of BOP incarceration will serve no legitimate purpose other than pure punishment, and would incur greater punishment on Mr. Crayton than the Guidelines contemplate.  As there are other mechanisms by which this Court can fulfill the goal of punishment, including sentencing Mr. Crayton to serve time in a halfway house, a sentence to BOP custody is not necessary to fulfil the goals of the Sentencing Guidelines.

### C.    The Factors Listed in 18 U.S.C. § 3553(a) Also Support the Imposition of Community or Home Confinement

In support of his request for a non-BOP sentence, Mr. Crayton herein argues that the applicable factors under 18 U.S.C. § 3553(a) also supports a sentence of community or home confinement, rather than one of imprisonment.

#### 1.    The First Factor: The Nature and Circumstances of the Offense and the History and Characteristics of Mr. Crayton

Both the offense conduct and Mr. Crayton's history and characteristics support the imposition of a mitigated sentence in this matter.  In addition to many factors described above that justify a downward departure, Mr. Crayton has presented letters to the Court that demonstrate his positive contributions to his family and community.  Moreover, Mr. Crayton has shown that he is deeply

1   remorseful and he has sought treatment for underlying mental health conditions that affected his

2   conduct in the instant case.  *See* PSR at ¶ 12.  Deep remorse is an appropriate factor for the Court to

3   consider under 18 U.S.C. § 3553(a)(1).  Moreover, Mr. Crayton has also shown that he is a loving

4   and able caregiver, a successful worker, and an active community member, all appropriate factors to

5   weigh under § 3553(a).

6       **2.    The Second and Third Factor: The Need for the Sentence Imposed and the
    Types of Sentences Available.**

7       The second factor under 18 U.S.C. § 3553(a) requires the Court to consider the need for the

8   sentence imposed a) to reflect the seriousness of the offense, to promote respect for the law, and to

9   provide just punishment; b) to afford adequate deterrence; c) to protect the public from further

10  crimes; and d) to provide the defendant with needed educational or vocational training, medical care,

11  or other correctional treatment in the most effective manner.  *See* 18 U.S.C. § 3553(a)(2).  In

12  conjunction with this factor, the Court should consider the third factor under 3553(a), which is "the

13  kinds of sentences available."  18 U.S.C. § 3553(a)(3).  Here, the kinds of sentences that are

14  technically available to the Court include probation, probation with a period of home or community

15  confinement, and a custodial sentence.  As recognized by the *Gall* Court, a probationary sentence is

16  "not granted out of a spirit of leniency" and "is not merely letting an offender off:"

17  
18          [c]ustodial sentences are qualitatively more severe that probationary sentences of
    equivalent terms.  Offenders on probation are nonetheless subject to several standard

19  conditions that substantially reduce their liberty.  Probationers may not leave the judicial
    district, move, or change jobs without notifying, and in some cases receiving permission

20  from, their probation officer or the Court.  They must report regularly to their probation
    officer, permit unannounced visits to their homes, refrain from associated with any

21  person convicted of a felony, and refrain from excessive drinking.  Most probationers are
    also subject to individual "special conditions" imposed by the Court.

22  *Gall, supra*, at 595-96 (citations omitted).

23      In many cases, probation coupled with a condition of home confinement is viewed as an

24  adequate punishment, both to promote respect for the law, reflect the seriousness of the offense, and

25  afford adequate deterrence.  Such is the case with Mr. Crayton.  Given his age, post-offense

26  rehabilitation, family support and deep remorse,  a sentence of incarceration is not necessary to fulfil

DEFENDANT'S SENTENCING MEMORANDUM
*UNITED STATES v. CRAYTON*, 07-803 MMC        **- 23 -**

the goals of public safety, avoid recidivism, and/or provide Mr. Crayton with necessary treatment or

training.  The real question is one of just punishment and deterrence.   Assuming the government's

loss assessment of $239,250.00, which the defense disputes, the Probation Officer has recommended

a sentence of twelve months and one day, which amounts to ten months of confinement with BOP

good time factored in.  That ten month sentence will set Mr. Crayton and his family back

substantially for numerous years to come, as he would lose a job that pays well and would not be

easily employable upon release from custody.  Given the fact that the family's mortgage debts from

refinancing now surpass the equity in their home in a depressed housing mortgage, a forced

foreclosure sale (which would undoubtedly occur while Mr. Crayton is incarcerated) will leave Mr.

Crayton in substantially greater debt than he now faces.  It will also put three dependant women and

one dependant child out on the streets.  Under these circumstance, the ten month sentence

recommended by Probation will have far greater effects than the custodial sentence itself, and will

cause undue hardship to Mr. Crayton and his family beyond that contemplated by the Guidelines.

Accordingly, a community confinement or home confinement sentence is the sentence "sufficient,

but no greater than necessary" to meet the sentencing goals articulated in 18 U.S.C. § 3553(a).[6]

## CONCLUSION

In light of the aforementioned factors, Mr. Crayton respectfully requests the Court to sentence

him to halfway house confinement or home confinement.

DATED: July 23, 2008

Respectfully submitted,

BARRY J. PORTMAN
Federal Public Defender

/S/

_____
ELIZABETH M. FALK
Assistant Federal Public Defender

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26