1  BARRY J. PORTMAN
   Federal Public Defender
2  ELIZABETH M. FALK
   Assistant Federal Public Defender
3  450 Golden Gate Avenue
   San Francisco, CA 94102
4  Telephone: (415) 436-7700

5  Counsel for Defendant CRAYTON

6

7              IN THE UNITED STATES DISTRICT COURT

8              FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10 UNITED STATES OF AMERICA,           )
                                       ) No. CR-07-803 MMC
11         Plaintiff,                  )
                                       ) **DEFENDANT'S RESPONSE TO**
12 vs.                                 ) **GOVERNMENT'S SENTENCING**
                                       ) **MEMORANDUMS**
13 LAWRENCE E. CRAYTON,                )
                                       ) Date:    July 30, 2008
14         Defendant.                  ) Time:    2:30 p.m.
                                       ) Court:   The Honorable Maxine M.
15 _____ )          Chesney

16

17                         **INTRODUCTION**

18         As previously argued in Defendant's Objections to Guideline Calculation Memorandum, the

19 government now seeks to hold Mr. Crayton accountable for theft by totaling every service voucher

20 he ever wrote while employed at Amtrak as Station Agent. This approach is simply not fair given

21 the other evidence in the case. As attested to by Mr. Crayton's supervisor, Jeff Snowden, who was

22 also interviewed by the case agent on this matter, it was station practice to write out large numbers of

23 legitimate service vouchers for passengers who experienced a disruption in service at the Amtrak

24 station in San Francisco. The government's chart does not have the requisite back-up documentation

25 to meets its burden to demonstrate loss amount in this matter, as its documentation does not

26 distinguish between legitimate and non-legitimate service disruption vouchers and in some cases, is

grossly incomplete. This Court should disregard the government's loss chart and accept Mr. Crayton's stipulation to a loss amount of between $70,000 and $120,000.[1]

## LEGAL STANDARD

Mr. Crayton concurs with the government's statement of the standard of proof that applies in this matter. He also concurs that it is appropriate for the Court to apply the clear and convincing standard of proof on loss amount, as stated in *United States v. Riley*, 335 F.3d 919, 925 (9th Cir. 2003), given the twelve level increase in his sentence that is potentially at issue on loss amount.

## ARGUMENT

**I. THE GOVERNMENT HAS NOT PROVEN THAT THE SERVICE VOUCHERS LISTED IN ITS LOSS AMOUNT SPREADSHEET ARE FAKE, AND MR. CRAYTON SHOULD NOT BE HELD ACCOUNTABLE FOR THEFT OF LEGITIMATELY ISSUED SERVICE VOUCHERS**

In support of its loss calculation chart, the government cites three factors about the service vouchers that proof "by clear and convincing evidence" that each and every voucher it now seeks to hold Mr. Crayton accountable for is a fake voucher. *See* Gov. Sent. Memo at 5:9-6:8. The first factor is the dollar amount of the vouchers themselves. *Id*. at 5:14. The second factor is that the backs of the majority of the vouchers are not filled out with the passenger name and information. *Id*. at 5:25-26. The third factor is the fact that the International Sales Office and/or Reservation Office or the conductors on the trains would not have asked Mr. Crayton to issue vouchers to disrupted passengers. *Id*. at 6:1-2. These arguments are not sufficient to meet the clear and convincing standard necessary to hold Mr. Crayton accountable for a loss amount higher than his stipulated loss of $70,000-$120,000.

**A. The Dollar Amount on the Vouchers Does Not Prove Anything**

As explained to the case agent by Mr. Crayton's past supervisor, Jeff Snowden, Mr. Crayton

---

[1] Mr. Crayton regrets the fact that there was an error in his original Objection Memorandum (Docket No. 18). On Page 2, Line 7, the memorandum should read "Mr. Crayton is willing to stipulate to a loss amount between $70,000 and $120,000", not between $70,000 and $200,000.

DEFENDANT'S REPLY SENTENCING MEMORANDUM
*UNITED STATES v. CRAYTON*, 07-803 MMC        - **2** -

1  was authorized to issue service vouchers in high dollar amounts.  *See* Interview Report of Jeff

2  Snowden, attached hereto as Exhibit A, at CRA 4625, Para. 4.  According to Mr. Snowden, there

3  were definitely "legitimate times when the service voucher would be issued at such a high rate of

4  credit."  *Id.* at Para. 2.  Mr. Snowden also informed the agents that Trains 11 and 14, as well as

5  Trains 5 and 6 were "repeatedly late and that as a result of that lateness, service vouchers were issued

6  to complaining customers as a means of attempting to gain repeat customers."  *Id*. at Para. 3.  Given

7  this information from Mr. Crayton's direct supervisor, it is difficult to understand how the

8  government can claim that all the service vouchers issued by Mr. Crayton for dollar amounts over

9  $50.00 are evidence of theft on his part.

10  Moreover, if the Court reviews Mr. Crayton's original objections, specifically Line Nos. 45,

11  71, 102, and 310, it is evident that ticket agents other than Mr. Crayton issued service vouchers in

12  large dollar amounts.  *See* Crayton's Objections Memorandum, Exhibit B.  The vouchers signed by

13  these other ticket agents are for $100, $500, $200, and $274.  Clearly, there was a practice at Amtrak

14  that service vouchers were allowed to issue to disrupted passengers in dollar amounts larger than

15  $50.00.  The amount of the service vouchers alone <u>does not</u> support the conclusion that the service

16  voucher itself is fake or illegitimate.

17  **B.  Mr. Crayton is Prepared to Testify that He Was Not Always Able to Write Out the Vouchers Fully Due to Time Constraints**

18  If this Court elects to hold an evidentiary hearing on this matter, Mr. Crayton is prepared to

19  testify that, although he understood that he was supposed to write out all the passenger information

20  on each service voucher, he was often unable to do so.  Many times, he was the only agent at the

21  station.  If a busload of angry disrupted passengers were dropped off at the San Francisco Terminal,

22  there would be a line of individuals demanding service vouchers.  In those circumstances, Mr.

23  Crayton would write out the service voucher as fast as possible to avoid the passenger experiencing

24  further disruptions.  Although he was not perfectly completing the process, he was meeting his

25  overarching directive; to retain angry passengers, and processing these individuals as soon as

26

possible.

In addition, Mr. Crayton is prepared to testify that the government is wrong about delayed passengers being "taken care of" at the train stations in Oakland and Emeryville if the train service was disrupted. *See* Gov. Memo at 5:15-16. Often times, when a train was disrupted, the bus service to take people to San Francisco would be waiting outside the station, and would leave as soon as the passengers were boarded. Only in San Francisco, the final termination point, would passengers have time to complain about service disruptions or lost baggage. Accordingly, San Francisco did experience a large number of passenger complaints. This information is in accord with the Snowden report.

### C. The Government Misunderstands Mr. Crayton's Notations on the Voucher

If this Court were to hold an evidentiary hearing, Mr. Crayton would be prepared to testify that the Sales Reservation Office and Customer Service Department did call him and inform him to issue vouchers to passengers. Moreover, Mr. Crayton would also be prepared to explain his voucher notations. If a passenger experienced a disruption in service, he often called the conductor on a train to verify that service was, in fact, disrupted. As such, the notations written on the vouchers indicating "per Conductor 5" is verifying the service disruption – not an indication that the conductor "told" him to issue the voucher.

In sum, the government has not submitted adequate proof to this Court that their list of service vouchers as listed on its Loss Calculation Spreadsheet accurately lists only illegitimate service vouchers, rather than legitimate and illegitimate vouchers. Under these circumstances, the Court should not rely on the government's Loss Calculation Spreadsheet as a reliable and accurate tally of the actual loss amount in this case.

### II. MR. CRAYTON'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS SECOND SET OF SPECIFIC OBJECTIONS TO THE SPREADSHEET

Mr. Crayton hereby responds to the government's revised spreadsheet, as well as its specific responses to his objections, as follows, divided by the categorization the government elected to use

in its Response briefing and supplemental chart. See Gov. Oppn to Defendant Sent. Memo, Docket No. 26, at Exhibit A (Docket No. 26-2).

### A. First Set of Government Objections Based Upon Legibility of Ticket Numbers.

The first group of the government's responses to Mr. Crayton's objections are a group of vouchers in which the ticket number is illegible. See Id., Exhibit A, Page 1. The government's responsive documents, which were received by defense counsel on July 24th, 2008, rather than July 23, 2008, are submitted for the Court's consideration hereto as Exhibit B. *See* Exhibit B, Government's Responsive Documents to Crayton's Objections, attached hereto. In sum, the government's substitute copies are not legible either - it is impossible to discern the ticket number on these vouchers. Moreover, the government's indication here that "legible copy available" is not helpful if the government does not deliver the legible copy to defense counsel. As counsel did not receive revised copies for these entries, Mr. Crayton's objections still stand. Finally, it is utterly unclear what "Crayton Responsible for Input" means. Given these problems with the government's objections, Mr. Crayton maintains his objections to the $6,509.00 of vouchers listed in Government's Objections, Exhibit A, Part One, on the basis of the fact that there is no possible way the government can prove that the ticket numbers listed on these vouchers were fraudulent, or "made up."

### B. Mr. Crayton Accepts the Government's Agreement to Remove $4099 from the Loss Calculation

This heading is self explanatory.

### C. Mr. Crayton Maintains His Objections Regarding Any Entries that Are Completely Unsupported by Service Vouchers, but Only By Stand-Alone 920 Sales Reports

A significant number of the objections responded to the government ($29,024) relate to entries on the spreadsheet that are only supported by dollar figures on a 920 Sale Report, rather than by a service voucher signed by Mr. Crayton. The government claims that these reports are "clear and convincing proof" that Mr. Crayton stole these amounts because he is the agent that modified or created the report. This argument is a stretch beyond that which justice allows. There is absolutely

no information, for example, whether or not the vouchers accepted and recorded on these sales reports were issued by entirely different stations, let alone entirely different station agent. There is no information which San Francisco ticket employee accepted these vouchers for payment, and whether or not Mr. Crayton was even involved in accepting these vouchers. The government's argument on this point is no more than a "hunch" that any transportation credits listed in reports signed off on by Mr. Crayton "must be" amounts stolen by him. Yet the fact that Mr. Crayton reconciled the reports does not mean he personally manipulated, handled, authorized, or approved any of the specific transactions that the reports document. The government's educated guess that all amounts listed on all sakes reports related to service vouchers must have been stolen by Mr. Crayton does not come close to meeting the "clear and convincing" standard. The $29,024 of objections in this vein should be deducted completely from the government's Loss Spreadsheet, to the extent the Court accepts the spreadsheet as evidence of loss amount.

### D.    The Defense's Alleged "Mistakes" Are Not Mistakes

Finally, the government's response to Mr. Crayton's objections indicates two vouchers that the government believes that the defense lists in error. See Exhibit A to Gov. Response at p. 5. A review of these entries reveals that the defense was correct to object to these vouchers.

First, in connection with the Ingleman voucher, the number on the voucher itself does not match the entry on the sales report. Nor is the service report dated. As such, there is no nexus between the $300.00 voucher and the sales report. *See, e.g.*, Exhibit C, attached hereto, at CRA 5353-5355. Focusing on page CRA 5354, under "Transportation Credits", the entry lists Voucher No. 855428100381061 as having been redeemed for $300.00. Id. However, the actual voucher number the government claims corresponds to this entry is 85542820038106. *Id* at 5355 (at top of page). This does not match the sales report entry, which was the basis for Mr. Crayton's objection.

The second "mistake" relates to the Littman voucher. Here, the government mistakenly writes that Mr. Crayton was objecting to the entire dollar amount of $100.00. However, a review of Exhibit B to Defendant's Objections to Loss Calculations reveals that the actual amount objected to was not

$100.00, but $14.00. See id. at pg. 3, Line No. 135. The reason counsel objected to the $14.00 is because the amount redeemed for a ticket purchase was only $86.00, despite the fact that the voucher amount was listed as $100.00. *See* Exhibit C, attached hereto, at CRA 387-389. This is due to the fact that a service voucher does not entitle the customer to return cash; if a customer uses a $100.00 voucher to purchase an $86.00 ticket, the customer only receives the $86.00 ticket, and no cash or credit back from the voucher. The Sales Report at issue here indicates that only $86.00 of this voucher was redeemed, which means that even if the service voucher was illegitimate, the only amount of cash that could have been removed from the drawer is $86.00. *See* Exhibit C, CRA00387. As such, Mr. Crayton's $14.00 objection on Line No. 135 in the Government's Loss Spreadsheet is entirely correct, and should be removed.

This is a small example of Mr. Crayton's overarching objection to the government's Loss Spreadsheet. Even after reviewing defense counsel's objections carefully, the agent assigned to this matter did not pick up on the problem with its own entry on the Littman voucher. This is true, even after the error was pointed out to him. Given the fact that a significant custodial sentence is at stake, it is the government's job to ensure that each and every entry they attempt to attribute to a defendant is backed by the requisite proof. In this case, the agency responsible for the Loss Amount Chart did not do this; it instead made assumptions that turned out to be faulty at the last moment, and did not utilize the proper amount of care from the beginning in attempting to determine which vouchers represented theft from Amtrak, versus which did not. As Mr. Crayton fully accepts responsibility for his crime, he has stipulated to a loss amount of $70,000 and $120,000 in recognition of the fact that he did issue vouchers that were not for legitimate passengers, but were instead used for illegitimate purposes. He is willing to admit that he issued quite a few of them – between $70,000 and $120,000 is his best estimate. He is extremely ashamed of his actions, and wants to fully accept responsibility for them. However, he cannot accept the government's premise that each and every service voucher he ever wrote while employed as the Station Agent of Amtrak was not legitimate, when he was the employee on the ground at the time, and he knows that he did write out many, many service vouchers

to genuinely disrupted passengers in multiple hundred dollar amounts.  Given the uncertainty that surrounds the government's calculations at this time, Mr. Crayton asks the Court to accept his stipulation to loss amount as the most fair and just result in this case.

**CONCLUSION**

Despite the fact that the government received a prosecution referral from Amtrak in May, 2005 for the instant case, the government waited over two and a half years to return an indictment against Mr. Crayton – until December 17, 2007.  During that time, Mr. Crayton made significant strides to rebuild his life after making terrible decisions at Amtrak - he found a relatively high-paying job as a bus driver that allows his disabled wife, two grandchildren, and great grandson to live in a home in Oakland that he pays the mortgage on.  Although the family barely meets their bills each month, they currently surviving.  If Mr. Crayton is sentenced to prison, he will lose his job – and the family does not have the means to keep up with this mortgage. The house will foreclose because the equity has reduced below that what the home is currently worth.  This will leave the family owing large amounts of money with nowhere to live.

The most important thing to Mr. Crayton is the ability to continue to work as a bus driver.  A lengthy sentence in a halfway house will separate Mr. Crayton from discretionary activities and his family for a significant period of time, but will avert financial disaster and allow him to make some sort of restitution payment.  He asks the Court to punish him, but to not to ruin his family's future. He asks this Court for a non-BOP custodial sentence.

DATED: July 29, 2008

        Respectfully submitted,

        BARRY J. PORTMAN
        Federal Public Defender

        /S/

        _____
        ELIZABETH M. FALK
        Assistant Federal Public Defender