Exhibit A

NATIONAL RAILROAD PASSENGER CORPORATION
OFFICE OF THE INSPECTOR GENERAL
OFFICE OF INVESTIGATIONS

## MEMORANDUM OF INTERVIEW

**TITLES:** Theft                                                                                                     **CASE NUMBER:** 04-194
**DATE OF REPORT:** June 8, 2005
**REPORT PREPARED:** Gilbert Ceniceros, SA, Noah Walls, SA
**PERSON INTERVIEWED:** Jeff Snowden ("Snowden"), Assistant Superintendent for Station Operations, Chicago

On June 7, 2005, at approximately 1:35 P.M., Office of Inspector General ("OIG") Office of Investigations ("OI"), Special Agents Gilbert Ceniceros and Noah Walls conducted an interview with Jeff Snowden, Assistant Superintendent for Station Operations in Chicago regarding the time he managed the San Francisco Station. Snowden was advised that this interview was free and voluntary and he was further requested not to draw any inferences or conclusions regarding the questions being asked. He was informed that the questions were investigative and not accusatory. Snowden provided his home address as 24338 Golden Eagle Drive, Plainfield, Illinois, 60544 and his home number of (815) 436-7868. He stated that he has worked for Amtrak for the past fifteen (15) years and has been at his current position for the past two (2) years.

OI Agents asked Snowden if he had ever supervised the San Francisco Station. Snowden stated that he had supervised the San Francisco Station, as well as the San Joaquin Corridor, for four (4) years from 1999 to 2003.

OI Agents then asked Snowden if he had ever supervised Lawrence Crayton[1] ("Crayton"). Snowden stated that he had supervised Crayton for four (4) years. Snowden further stated that Crayton was the San Francisco Station Agent and as the station agent he (Crayton) had supervised approximately four (4) other Amtrak employees. OI Agents asked Snowden to identify Crayton's responsibilities as a Station Agent. Snowden replied by stating that Crayton would sell tickets, load costumer baggage, handle customer complaints, keep track of daily sales and prepare Amtrak funds for deposit.

OI Agents asked Snowden if he had ever reviewed Craytons work. Snowden stated that he had reviewed Craytons work when he (Snowden) had conducted mini station audits. OI Agents asked Snowden how often he had conducted such mini audits[2] at the San Francisco Station. Snowden stated that he would perform an audit about 3 to 4 times with in a year. OI Agents asked Snowden if he had ever discovered any discrepancies in

---

[1] Station Agent of the San Francisco Station
[2] Lighting is working properly and doors are closing and that safety precautions are being followed, checks that the cash box amounts match the receipts amounts in the cash drawers, proper uniforms being worn and checking safes, along with all station sales and station deposits.

1

CRA-004619

Craytons work. Snowden stated that he didn't recall any discrepancies with Craytons work.

OI Agents asked Snowden if he was familiar with the service voucher. Snowden stated that he knew what a service voucher was and explained that a service voucher was used when there was a disruption of service with a train such as a train being late, buses not getting to the stations on time, etc. OI Agents asked Snowden if he had ever reviewed Crayton's voucher booklets. Snowden stated that he did check Craytons voucher booklets to make sure that they were properly filled out. OI Agents asked Snowden if there was a dollar amount limit for the voucher. Snowden stated that he did not recall what the amount was, but the voucher booklet had the instructions on the cover with the amount limit. OI Agents asked Snowden if a large amount, for example six-hundred ($600.00) dollars would be an excessive amount of money for service vouchers. Snowden stated that for other stations it would be, but the Zephyr and the Coast Starlight trains were constantly late, which caused a large amount of customer complaints. Snowden further added that service vouchers would then be given out to keep repeat customers satisfied.

OI Agents asked Snowden what he was looking for when he conducted a mini audit. Snowden stated that he would make sure that lighting and doors were in good working order, proper uniforms were being worn, the cash drawers and safes, along with all station sales and deposits were in order. OI Agents asked Snowden if he ever checked the stations financial records. Snowden stated that he would make sure that all the sales matched with the records, but as far as doing an in-depth financial audit he said, "I would rely heavily on Philadelphia to check the financial audits." OI Agents asked Snowden if he had any training or had he received any training in auditing of financial records. Snowden stated that he did not nor has he ever received any formal training in accounting. Snowden add that all of his training had been obtained as a ticket clerk and a station manager.

No further questions were asked of Snowden and the interview ended at approximately 1:35 P.M.

Chief Inspector: _____Wayne Stovall_____

Deputy Inspector General/Counsel: _____James E. Jasium Jr.____

2

CRA-004620

NATIONAL RAILROAD PASSENGER CORPORATION
OFFICE THE INSPECTOR GENERAL
OFFICE OF INVESTIGATIONS

Investigative Follow-Up Report

CASE NUMBER: 04-194
TITLE: Embezzlement
DATE OF REPORT: September 7, 2007
REPORT PREPARED BY: Special Agents Noah L. Walls and Gilbert Ceniceros
PERSON INTERVIEWED: Jeff Snowden, Asst. Supt., Station Operations

On August 30, 2007, Office of the Inspector General ("OIG"), Office of Investigations ("OI"), Special Agents Noah L. Walls and Gilbert Ceniceros conducted an interview of Amtrak employee Jeff Snowden ("Snowden") regarding an allegation of embezzlement at the San Francisco Station. The interview was being conducted at the request of AUSA Tina Hua ("Hua"), Office of the United States Attorney, San Francisco. Snowden was advised that the interview was free and voluntary and could be terminated at any time. Snowden was further advised not to draw any inferences or conclusions from the questions being asked, as the questions were investigative in nature and not accusatory.

Snowden is currently assigned as the Assistant Superintendent for Station Operations, Chicago, Illinois. Snowden has been employed by Amtrak for seventeen (17) years and has been in his current position for four (4) years. Snowden reported his work address as 525 West Van Buren Street, Chicago, IL. His work number was given as (312) 880-5325. Snowden's current residence address is 24338 Golden Eagle Drive, Plainfield, Illinois 60544.

Of note, OI initially interviewed Snowden on June 7, 2005, wherein he stated that he had supervised both the San Francisco Station and The San Joaquin Corridor for four (4) years from 1999 to 2003. When asked if he had supervised Lawrence Eugene Crayton ("Crayton"), Snowden stated that he had supervised Crayton for four (4) years and that Crayton was the San Francisco Station Agent.

When asked if he recalled being interviewed June 7, 2005, regarding the allegation of embezzlement at the San Francisco Station, Snowden stated to OI that he recalled the interview, however, he, "vaguely" remembered the details of that interview. When asked if he recalled supervising Lawrence Crayton, Snowden stated that he recalled supervising Crayton for approximately four (4) years. When asked if he recalled advising OI Agents during that interview that he had conducted mini-audits[1] at the San Francisco Station, Snowden stated that he recalled making that statement regarding those audits. OI then asked Snowden the number of times he conducted those audits and what were the results of those audits. Snowden told OI Agents that he conducted those audits three (3) to four (4) times a year and that at the conclusion of those audits nothing appeared to be unusual.

---

[1] Mini-Audit- audits conducted by Station Managers to ensure paperwork was in order and the station appearance, as well as employees was within specified policy. Audits were not in debt financial audits.

1

When asked to explain that statement, Snowden stated that the ticket clerks and station agent appeared to be performing their duties. When asked if his audits ever revealed evidence of embezzlement, Snowden stated that those audits never revealed any occurrences of embezzlement.

When asked if he recalled OI Agents questioning him regarding the Form 28 Service Voucher[2], Snowden stated that he remembered being questioned about the service voucher, but that his remembrance was somewhat "vague." OI Agents then asked Snowden if he could recall the monetary cap that Amtrak had placed on the Form 28. Snowden stated that he could not recall the exact amount that was placed on the service voucher. OI Agents asked Snowden if he recalled during the interview of June 7, 2005, being asked if he thought $600 was an excessive amount of credit to issue on a service voucher. Snowden stated that he could not specifically recall that question being asked.

OI then asked Snowden if he thought that it was unusual for a service voucher to be issued with such a high rate of credit. Snowden stated that he believed that there were times when the service voucher would be issued at such a high rate of credit. Snowden stated that for example, a large family group with lost bags or were on-board an extremely late train would rate the issuance of a service voucher and that it could be possible for that service voucher to reach or exceed $600, depending on the size of the group. Snowden added that Trains 11 and 14 (Coast Starlight), as well as Trains 5 and 6 (California Zephyr) were repeatedly late and that as result of that lateness, service vouchers were issued to complaining passengers as a means of attempting to gain repeat customers. Snowden concluded by stating, "As of today the Zephyr was repeatedly late. We did what we could to gain repeat customers."

OI Agents then asked Snowden, specifically, if the issuance of a service voucher in excess of $600 or more to an individual passenger would be considered unusual. Snowden stated that, that situation would be considered unusual. When asked if he thought it would have been unusual for a station the size of San Francisco to issue service vouchers at a higher volume than larger stations (i.e.N.Y., Pennsylvania, Los Angeles Union Station, Chicago Union Station or Washington D.C. Union Station), Snowden stated, "Yes, I would, that would have been very surprising to me." When asked if it would have been unusual for a station the size of San Francisco to issue service vouchers in excess of $15,000 a month, Snowden stated, "You know, it's really hard to say, because of the high traffic and the number of transfer between Emeryville and San Francisco. Snowden added that it was possible to issue service vouchers during the busier times that could total as much as $15,000 a month. When asked if Crayton had the authority to issue vouchers in excess of $500, $600, $700 and $1000, Snowden stated, "I want to say yes, I don't think there were specific guidelines, we were trying to recover repeat customers."

OI Agents then asked Snowden if it was normal practice for a station agent to issue a service voucher at the request of a conductor, the Reservation Sales Office ("RSO") or

---

[2] Form 28 (Service Voucher)-form no longer utilized by Amtrak that was issued to inconvenienced passengers for service disruptions. The credit value was recommended not to exceed $50.00.

International Sales Office ("ISO"). Snowden stated, "Well, I can say there have been occasions where that has occurred." OI, however, noted that when pressed, Snowden couldn't provide an occasion wherein any of the aforementioned activity had occurred. Snowden further stated that the conductors have charge of the trains and that they have their own method of recovery. Snowden further stated that the RSO did not have the authority to either order or request that a station agent or ticket clerk issue a service voucher to anyone. Snowden stated to OI Agents that he wasn't that familiar with the functions of the ISO.

When asked if Crayton had ever sought his approval before issuing service vouchers that exceeded the limit imposed by Amtrak, Snowden stated that Crayton had never conferred with him before issuing those service vouchers. OI then asked Snowden if he had ever reviewed the 920s and noticed that all the service vouchers were issued in public identification numbers of the subordinate clerks. Snowden stated that he had not noticed that documentation on the 920s. When asked he had ever discussed the issuance of any service vouchers with Crayton, Snowden told OI that he had never had that conversation with Crayton.

In conclusion, Snowden stated that he could not recall the cap that had been placed on the service vouchers and that if he had been aware of service vouchers being issued that exceeded the cap he would have taken some type of action. Further, Snowden stated had he known that the service vouchers were being issued in amounts that exceeded the limit he would have informed Crayton that he would have to be granted approval before those service vouchers were issued.

Having nothing further to add by Snowden this interview was terminated at 7:20 am, PST.

Chief Inspector: _____

Deputy Inspector General/Counsel: _____

3

CRA-004626